HENRY M. RICE, ADMINISTRATOR, ETC., V. THE THIRD NATIONAL BANK OF DETROIT, GARNISHEE OF CHARLES W. GAUTHIER.

[See 97 Mich. 414.]

*Garnishment—Liability of bank.*

In proceedings against a bank as garnishee of a depositor, the officers of the bank testified to an agreement with the depositor that he should at all times keep a balance to his credit of $1,000 to cover his liability on returned drafts. At the time of the service of the writ of garnishment the depositor's balance was less than $1,000, and it appeared from the testimony of the plaintiff that both before and after such service said balance had been and was far below that sum. And it is held that proof of the existence of said agreement was not negatived by said last-mentioned testimony, the same being entirely consistent therewith.

Error to Wayne. (Frazer, J.) Argued January 9, 1895. Decided February 26, 1895.

Garnishment proceedings. Defendant brings error. Re-

versed, and judgment entered in this Court for defendant. The facts are stated in the opinion, and in 97 Mich. 414,

*C. E. Warner,* for appellant.

*Charles W. Casgrain,* for plaintiff.

McGRATH, C. J.   This cause was before this Court in 97 Mich. 414.   A second trial resulted in a verdict for plaintiff.

The testimony of the officers of the bank as to the existence of the agreement that a balance of $1,000 should be kept on deposit to cover Gauthier's liability on returned drafts was not disputed, unless it can be said that the testimony that at times both before the service of the writ and afterwards such balance did not appear by the books of the bank to have been retained tends to negative the fact of the existence of such an agreement.   On November 20, when the writ was served, there was a balance of $979.23 to the credit of the principal defendant.   On November 21 this balance was reduced by debits, and on November 22 it was reduced to $7.94.   It was also shown that at various times before the service of the writ, and after the date last given, the balance to the credit of the principal defendant was much below the $1,000.   These facts were shown from the books by one who was an employé of the bank during the period covered by the transactions, but had no knowledge of their nature.   He testified that—

"Gauthier was accustomed to bring in, from time to time, a large number of drafts in one deposit.   They were deposited as cash, and were placed to his credit on the day they were deposited.   These drafts were forwarded for collection, and, in case they were returned unpaid, any of them, we would charge them back to Mr. Gauthier's account.   The credit which was given to Gauthier upon these drafts upon the day that they were deposited was nothing more than a temporary credit, subject to be offset by these drafts returned unaccepted and unpaid."

104 MICH.—12.

The witness could not tell whether the debits were on account of unaccepted drafts or not. He further testified that—

" We do not charge back these drafts until we get them back, and find them unpaid. I do not know anything about this account in particular. I am only speaking of it as a representative of a class of accounts. We would not assume that any particular draft would come unpaid. We waited till it did come back, and then charged it up to the account. All the entries on this account were made by Mr. McDonald, who is still in the city. * * * Gauthier had three ways of raising money; that is, by depositing the actual cash or cash items, by deposits of unaccepted drafts, and by deposits of discounts. The method in detail of doing business with Gauthier was as follows: Gauthier was engaged in the fish business,—forwarding fish. He would forward fish, generally to parties in the East, and at the time he shipped the fish, or shortly afterwards, he would draw upon them for the value of the shipments. Those drafts he would deposit with us. We would give him credit for the face of them, and we would then forward them to our correspondents, wherever the party might be located on whom they were drawn, for collection, and when the drafts were paid they would remit the proceeds, and that would reimburse us for what we had credited him; or, if it was not, it would be returned to him, and we would charge it back to him, and reimburse ourselves.

" Q. In other words, wipe out the credit that he had got on the basis of the drafts the day they were drawn?

" A. Yes, sir.

" Q. Suppose he had this balance of $975, and he had went in there with a check for $900, would you have honored the check or thrown it out?

" A. Ordinarily, we would have refused it, except as in the case of granting a man an overdraft, if he can show—

" Q. Would you have honored it, or wouldn't you?

" A. I cannot answer that by yes or no, because we might have one time and we might not. It would be optional with us. These things depend very largely upon the circumstances of the case.

" Q. You might have honored it under those circum-

stances when it would be optional whether you would or not?

" A. We might have honored it when it was optional with us, I mean. The bank had nothing to do with Mr. Rice, the plaintiff in this case, at all. As I understand, so far as this question is concerned, it is merely a question between our bank and Mr. Gauthier."

Testimony was introduced by defendant which tended to show that the items charged to the depositor on November 21 and November 22, by which the balance was reduced, were for returned drafts, although it was conceded that one debit of $5 was on account of cash paid upon a check drawn by Gauthier. The bank continued, after the service of the writ, to deal with Gauthier as formerly, and it was shown that two drafts of $500 each, which had been credited to Gauthier prior to the service of the writ, were afterwards returned to the bank, and charged up against Gauthier.

It does not follow that, because the balance was at times reduced below the sum named, the agreement did not exist. The reduction of the balance may have been due to the return of the unaccepted drafts, or may have been permitted because no drafts were outstanding. Proof of the existence of the agreement is not negatived by proof of a fact or circumstance entirely consistent with the existence of such agreement. The circumstance shown is not necessarily associated with or related to the fact which plaintiff sought to establish, viz., that no such agreement existed.

The defendant was entitled to a verdict, and the judgment is reversed, and one entered here for defendant.

The other Justices concurred.